## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAGATAY CAKAN,<br><br>      Petitioner,<br><br>v.<br><br>JOSEPH D. McDONALD, Jr., in his official capacity as Sheriff of Plymouth County; PATRICIA H. HYDE, in her official capacity as Acting Field Office Director, Boston Field Office, United States Immigration and Customs Enforcement; TODD M. LYONS, in his official capacity as Acting Director, United States Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; PAMELA JO BONDI, in her official capacity as United States Attorney General,<br><br>      Respondents. | No. 1:25-cv-11094-JEK |

## MEMORANDUM AND ORDER ON
## PETITION FOR A WRIT OF HABEAS CORPUS

**KOBICK, J.**

Petitioner Cagatay Cakan, a citizen of Turkey, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 seeking an order of immediate release from detention. Cakan has been a lawful permanent resident of the United States since 2001. On February 20, 2025, U.S. Citizen and Immigration Services ("USCIS") issued him a renewed temporary green card, valid through February 19, 2026, that evidenced his permanent resident status and stated that it would facilitate his work and travel. Three months earlier, U.S. Immigration and Customs Enforcement ("ICE") had served Cakan with and filed in the Boston Immigration Court a Notice to Appear,

thus commencing removal proceedings against him under 8 U.S.C. § 1229a. The Notice to Appear charged that Cakan was subject to removal from the United States under 8 U.S.C. § 1182(a)(7)(A)(i)(I), but it did not assert that Cakan had abandoned or relinquished his lawful permanent resident status or otherwise failed to maintain permanent residency in the United States.

Following a month-long trip abroad, Cakan returned to the United States on April 9, 2025 and, after presenting his valid green card and Turkish passport, was detained at Boston Logan International Airport. The U.S. Customs and Border Protection ("CBP") officer at the airport determined that Cakan should not be treated as a lawful permanent resident, but rather should be treated as an applicant for admission to the United States, because of evidence that he had "abandoned or relinquished" his lawful permanent resident status, within the meaning of 8 U.S.C. § 1101(a)(13)(C)(i). Having made that determination, the CBP officer regarded Cakan as an applicant for admission subject to inspection under 8 U.S.C. § 1225(a)(3). The officer then decided that Cakan was not "clearly and beyond a doubt entitled to be admitted" under 8 U.S.C. § 1225(b)(2)(A), and ordered him detained pending the conclusion of his removal proceedings.

Cakan's petition for a writ of habeas corpus contends that, under the immigration laws, he should have been treated as a lawful permanent resident, not an applicant for admission, and thus should never have been detained pending removal proceedings. He seeks an order releasing him from detention, but does not ask this Court to determine whether, in fact, he has abandoned or relinquished his lawful permanent resident status. The government respondents contend that this Court lacks jurisdiction to consider Cakan's petition and, further, that Cakan is lawfully detained as an applicant for admission under 8 U.S.C. § 1225(b)(2)(A). Nevertheless, the government acknowledges that if Cakan were improperly deemed by the CBP officer to be an applicant for admission under 8 U.S.C. § 1225(b)(2)(A), it would have no lawful basis to detain him. Agreeing

2

with Cakan that this Court has jurisdiction to consider his petition and that the CBP officer did not have unilateral authority to determine that Cakan was an applicant for admission rather than a lawful permanent resident, the Court will grant his petition and order his immediate release from detention. The Court expresses no view on any matters pertaining to Cakan's ongoing removal proceedings.

## BACKGROUND

### I.    Statutory and Regulatory Framework.

All aliens[1] seeking admission[2] or readmission to the United States must be inspected by an immigration officer. 8 U.S.C. § 1225(a)(3); *see Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). As a general rule, aliens who seek to enter the United States after arriving at a port of entry, such as an airport, are treated as "applicant[s] for admission." 8 U.S.C. § 1225(a)(1). Applicants for admission must demonstrate to the examining immigration officer that they are "clearly and beyond a doubt" entitled to be admitted. *Id.* § 1225(b)(2)(A). An applicant for admission who fails to do so "shall be detained" for removal proceedings. *Id.* Aliens subject to mandatory detention under Section 1225(b)(2)(A) may nevertheless be temporarily paroled into the United States. *See id.* § 1182(d)(5)(A).

A different set of rules applies to aliens who have become lawful permanent residents ("LPRs") of the United States. LPRs can leave and return to the country more freely than most other aliens. *See Katebi v. Ashcroft*, 396 F.3d 463, 466 (1st Cir. 2005) ("Returning permanent

---

[1] The term "alien" refers to "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

[2] In the immigration law context, the terms "admission" and "admitted" mean, "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

residents are permitted to reenter the country after foreign travel.").  In large part, this is because, by statute, LPRs "shall not be regarded as seeking an admission into the United States for purposes of the immigration laws" unless one of six exceptions applies. 8 U.S.C. § 1101(a)(13)(C). One of those exceptions, as relevant here, applies to an LPR who "has abandoned or relinquished" his LPR status. *Id.* § 1101(a)(13)(C)(i).

When a non-citizen seeking to reenter the United States "has a colorable claim to returning" to LPR status, "the government bears the burden of proving by 'clear, unequivocal, and convincing evidence' that he abandoned his status while out of the country and is therefore ineligible for admission into the United States." *Mahmoud v. Barr*, 981 F.3d 122, 125 (1st Cir. 2020) (quoting *Katebi*, 396 F.3d at 466). Determining whether an LPR has abandoned his permanent resident status is a "fact-intensive question." *Katebi*, 396 F.3d at 466. "To qualify as a returning permanent resident, the resident" (1) "must have acquired lawful permanent resident status," (2) "must have retained that status from the time that [he] acquired it," and (3) "must be returning to an unrelinquished lawful permanent residence after a temporary visit abroad." *Id.* (quotation marks omitted). If the non-citizen "is not returning from 'a temporary visit abroad,' he will be deemed to have abandoned permanent resident status and be excluded from the United States." *Id.*[3]

When seeking to enter the United States at a port of entry, "[a] person claiming to have been lawfully admitted for permanent residence must establish that fact to the satisfaction of the inspecting officer and must present proper documents in accordance with [8 C.F.R.] § 211.1." 8

---

[3] A "'permanent resident returns from a temporary visit abroad only when (a) the permanent resident's visit is for a period relatively short, fixed by some early event, or (b) the permanent resident's visit will terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time.'" *Katebi*, 396 F.3d at 466 (quoting *Chavez-Ramirez v. INS*, 792 F.2d 932, 936-37 (9th Cir. 1986)). The government does not contend here that Cakan's trip abroad from March to April 2025 was anything other than temporary.

C.F.R. § 235.1(f)(1)(i). The term "lawfully admitted for permanent residence" means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). If the non-citizen is returning to the United States "after a temporary absence of less than 1 year," he can satisfy 8 C.F.R. § 211.1's documentary requirement by presenting, among other things, a "valid, unexpired Form I-551," which is also referred to as a permanent resident card or a green card. 8 C.F.R. § 211.1(a)(2).

## II. <u>Factual Background.</u>

Cakan is a native and citizen of Turkey. ECF 10-1, ¶ 7. On September 18, 2001, he was granted lawful permanent resident status in the United States, *id.* ¶ 8, which he obtained as a beneficiary of the Diversity Visa Lottery Program, ECF 1, ¶ 9. Cakan's wife and two children obtained their LPR status in 2015. *Id.* ¶ 10; ECF 13, at 1-2. Cakan and his wife own a house in Medfield, Massachusetts, ECF 13, at 38, his children are enrolled in school there, *id.* at 2, and Cakan filed a Massachusetts income tax return for the 2023 and 2024 fiscal years, *id.* at 28-37. Cakan owns multiple foreign businesses, however, and he regularly travels abroad to manage these businesses. *See* ECF 1, ¶¶ 4, 11.

Since becoming an LPR in 2001, Cakan has spent the majority of his time abroad. *See* ECF 10-1, ¶¶ 8-13. He met his wife in Turkey shortly after becoming an LPR. *See* ECF 13, at 1. They married in 2003 and had one child in 2006, followed by a second in 2007. *See id.* Between 2003 and 2007, Cakan visited the United States only four times, staying in the country for approximately four months in total across these trips. *See* ECF 10-1, ¶ 9. After departing the United States on January 10, 2007, Cakan did not return again for over nine years, until June 29, 2016. *See id.* ¶¶ 9(d), 11(a).

On August 25, 2015, Cakan applied for and was awarded a B-1/B-2 nonimmigrant visa while he was in Istanbul, Turkey. *Id.* ¶ 10. B-1 visas permit nonimmigrant aliens to visit the United States for business, and B-2 visas permit nonimmigrant aliens to visit the United States for pleasure. *See* 22 C.F.R. § 41.31(a). On his visa application, Cakan answered "no" to the question, "Have you ever been in the U.S[.]?" ECF 10-1, ¶ 18. Using his nonimmigrant visa, Cakan traveled to the United States three times between June 2016 and June 2017, with each trip lasting between four and ten days. *See id.* ¶ 11. Before the third of these visits, on May 14, 2017, Cakan filed a Form 1-90 ("Application to Replace Permanent Resident Card") with USCIS. *Id.* ¶ 12. USCIS issued Cakan a replacement green card on December 9, 2017. *Id.* Using his green card, Cakan visited the United States six times between December 2017 and December 2019, with each trip lasting between four and eight days. *See id.* ¶ 13.

On December 23, 2020, Cakan arrived at Boston Logan International Airport in Boston, Massachusetts, on a commercial flight from Istanbul, Turkey. *Id.* ¶ 14. He identified himself as an LPR, and he presented an unexpired Turkish Passport and an unexpired green card. *Id.* Cakan informed a CBP officer that he was a permanent resident of the United Arab Emirates ("UAE"), and he presented a resident permit from the UAE. *Id.* ¶ 15. He also stated that he lived and worked in the UAE, and that he did not own any property in the United States. *Id.* Cakan did, however, state that he had filed income taxes in the United States in 2018 and 2019. *Id.* He further admitted that he had remained outside the United States for over eight years and that his original resident permit had expired, requiring him to obtain a nonimmigrant visa to return to the country. *See id.* ¶ 16.

Later that day, CBP issued Cakan a Notice to Appear ("NTA"), alleging, among other things, that he had failed to establish and maintain a permanent domicile in the United States. *See*

*id.* ¶¶ 17-18. CBP seized Cakan's green card, issued him a temporary version of that document, and paroled him into the United States for one year. *See id.* ¶ 17; ECF 1, ¶ 12. On December 27, 2020, Cakan left the United States. *See* ECF 10-1, ¶ 21. One day later, the Department of Homeland Security ("DHS") filed a superseding NTA, alleging that Cakan had "failed to establish and maintain permanent domicile [in] the United States." ECF 13, at 14. The superseding NTA charged that Cakan was subject to removal from the United States under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for failure to possess "a valid unexpired immigrant visa, reentry permit, . . . or other valid entry document." *Id.*; *see* ECF 10-1, ¶ 19. Neither the original NTA nor the superseding NTA was ever filed in an immigration court. *See* ECF 10-1, ¶¶ 20-21. The government thus chose not, at that time, to pursue removal proceedings against Cakan.

Between 2021 and 2025, Cakan periodically visited the United States. *See* ECF 10-1, ¶ 22. The record does not indicate the dates of those visits or the total amount of time that Cakan spent in the United States between 2021 and 2025. CBP issued Cakan three temporary green cards at Logan Airport during this period, each of which was valid for one year. The first was issued on December 1, 2022, ECF 1-1, at 7-8, and the second on November 15, 2023, *id.* at 5-6. On October 31, 2024, ICE served Cakan by mail with another superseding NTA, which it then filed in Boston Immigration Court on November 13, 2024. *See* ECF 10-1, ¶ 23; ECF 13, at 16-18. This superseding NTA identified Cakan as an "arriving alien" and again charged that he was subject to removal from the United States under 8 U.S.C. § 1182(a)(7)(A)(i)(I). *See* ECF 13, at 16, 18. Unlike the December 28, 2020 NTA, however, the October 31, 2024 NTA did not allege that Cakan had failed to maintain a permanent residence in the United States. *See id.* at 16-18.

On February 20, 2025, Cakan was issued another temporary green card, which indicated that it would be valid until February 19, 2026. *See* ECF 1-1, at 3. The document was endorsed by

CBP and bore a stamp stating that it served "as temporary I-551 evidencing permanent residency." *Id.* The following text appeared under the section titled "Itinerary/Comments": "Document serves to facilitate WORK & TRAVEL." *Id.* at 4. Cakan subsequently departed the United States on March 5, 2025. ECF 10-1, ¶ 25.

On April 9, 2025, Cakan flew into Logan Airport. *Id.* ¶ 26. When he reached a CBP officer, he presented an unexpired Turkish passport and the temporary green card that he had been issued on February 20, 2025. *See id.* In contrast to Cakan's previous visits, however, the CBP officer determined that Cakan was subject to removal proceedings and detained him. *See id.* ¶ 27. The government later explained that, upon Cakan's arrival at Logan Airport, "CBP considered [him] to be seeking admission to the United States pursuant to 8 U.S.C. § [1101(a)(13)(C)(i)] because of evidence that [he] had 'abandoned or relinquished' his LPR status." ECF 10, at 7. Upon inspection of Cakan as an applicant for admission under 8 U.S.C. § 1225(a)(3), the CBP officer concluded that Cakan was not clearly and beyond a doubt entitled to be admitted, and that he must therefore be detained pursuant to 8 U.S.C. § 1225(b)(2)(A). ECF 10, at 7. On April 10, 2025, CBP transferred custody of Cakan to the Enforcement and Removal Operations division of ICE. *See* ECF 10-1, ¶ 27; ECF 1, ¶ 14. Cakan is currently detained by ICE at the Plymouth County Correctional facility. ECF 1, ¶ 4. ICE has since denied him release after a custody review because he has been categorized as an arriving alien, *id.* ¶ 14, and denied his request to be paroled pursuant to 8 U.S.C. § 1182(d)(5)(A), ECF 17.

Cakan filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in this Court on April 24, 2025. The petition alleges that his detention violates the Due Process Clause of the Fifth Amendment, federal immigration statutes, and the Administrative Procedure Act, 5 U.S.C. § 706(2). *See* ECF 1, at 1 and ¶¶ 1, 15. Cakan names as defendants the following individuals in

their official capacities: Joseph McDonald, Jr., the Sheriff of Plymouth County; Patricia Hyde, the

Acting Field Office Director for ICE's Boston Field Office; Todd Lyons, the Acting Director of

ICE; Kristi Noem, the Secretary of Homeland Security; and Pamela Bondi, the United States

Attorney General. *Id.* ¶¶ 5-8. Cakan asks the Court to order his immediate release, set a bond

hearing as soon as possible, or direct the defendants to show cause why he should not be released

from custody. *See id.* ¶ 19. After granting the government's requests for additional time to respond

to the petition, ECF 7, 9, the Court held a hearing on May 8, 2025 and took Cakan's petition under

advisement, ECF 14.

**DISCUSSION**

## I.   <u>Jurisdiction.</u>

The government first contends that this Court lacks jurisdiction to consider Cakan's

petition for a writ of habeas corpus. The statute Cakan invokes, 28 U.S.C. § 2241, gives federal

courts jurisdiction to review habeas petitions filed by immigration detainees who assert that they

are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2241(c)(3); *see Goncalves v. Reno*, 144 F.3d 110, 120 (1st Cir. 1998). The government argues,

however, that another statute—8 U.S.C. § 1252(b)(9)—strips this Court of jurisdiction to consider

Cakan's petition claiming that he is unlawfully detained based on the CBP officer's determination

that he has abandoned his LPR status.

Section 1252(b)(9) provides, in pertinent part:

Judicial review of all questions of law and fact, including interpretation and application of
constitutional and statutory provisions, arising from any action taken or proceeding brought
to remove an alien from the United States under this subchapter shall be available only in
judicial review of a final order under this section. Except as otherwise provided in this
section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28
or any other habeas corpus provision, . . . or by any other provision of law (statutory or
nonstatutory), to review such an order or such questions of law or fact.

9

8 U.S.C. § 1252(b)(9). The statute works in conjunction with 8 U.S.C. § 1252(a)(5), which provides that "'the sole and exclusive means for judicial review of an order of removal' is 'a petition for review filed with an appropriate court of appeals.'" *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020) (quoting 8 U.S.C. § 1252(a)(5)). "Adding belt to suspenders, section 1252(b)(9) strips federal courts of jurisdiction to decide legal and factual questions arising from an alien's removal in any other context, including on a petition for a writ of habeas corpus." *Id.*

Congress enacted Section 1252(b)(9) to "consolidate and channel review of all legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively in the courts of appeals." *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 9 (1st Cir. 2007) (italics omitted). While the breadth of this provision is significant, it is not "limitless." *Id.* at 10. The First Circuit has adopted a "bounded reading" of Section 1252(b)(9), instructing that the phrase "arising under" "cannot be read to swallow all claims that might somehow touch upon, or be traced to, the government's efforts to remove an alien." *Id.*; *accord Jennings*, 583 U.S. at 293-94. The statute does not, under this reading, bar district courts from reviewing claims "that are independent of, or wholly collateral to, the removal process." *Aguilar*, 510 F.3d at 11; *see Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) ("[Section] 1252(b)(9) 'does not present a jurisdictional bar' where those bringing suit 'are not asking for review of an order of removal,' 'the decision to seek removal,' or 'the process by which removability will be determined'" (ellipses omitted) (quoting *Jennings*, 583 U.S. at 294-95)). And relevant here, Section 1252(b)(9) does not strip federal courts of jurisdiction to consider habeas petitions filed to challenge a petitioner's ongoing detention rather than matters pertaining to removal proceedings. *See, e.g., Aguilar*, 510

F.3d at 11 ("[District courts retain jurisdiction over challenges to the legality of detention in the immigration context."); *Hernandez v. Gonzales*, 424 F.3d 42, 42 (1st Cir. 2005) (same).

Cakan's habeas petition challenges only his ongoing detention. *See* ECF 1. He does not challenge an "order of removal," "the decision to seek removal" or "the process by which removability will be determined." *Regents*, 591 U.S. at 19 (quotation marks and ellipses omitted). Nor, as counsel emphasized during the hearing on his petition, does Cakan seek a determination from this Court whether, in fact, he has abandoned or relinquished his LPR status within the meaning of 8 U.S.C. § 1101(a)(13)(C)(i). Because Cakan's petition is limited to contesting the lawfulness of his detention by ICE, Section 1252(b)(9) does not strip this Court of jurisdiction to entertain his claims. *See Aguilar*, 583 F.3d at 11-12.

The government resists this conclusion, arguing that the Court lacks jurisdiction because Cakan's detention claim—that the CBP officer improperly determined that he abandoned his LPR status and improperly classified him as an applicant for admission subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A)—"arises from" his ongoing removal proceedings. *See* ECF 10, at 17. This argument reflects a misapprehension of the distinct issues presented by Cakan's removal proceedings and his habeas petition. Whether Cakan is subject to removal will hinge in large part on the Immigration Judge's factual determination of whether he abandoned his LPR status. *See* 8 U.S.C. §§ 1101(a)(13)(C)(i), 1229a(c)(1). In contrast, whether Cakan is lawfully detained will hinge, as discussed below, on the legal question of whether the CBP officer who inspected Cakan possessed the authority to unilaterally determine that he had abandoned his LPR status and then treat him as an applicant for admission subject to mandatory detention under Section 1225(b)(2)(A). The legal issue raised by Cakan's habeas petition is "wholly collateral to the

removal process" and therefore not subject to Section 1252(b)(9)'s jurisdictional bar. *Gicharu*, 983 F.3d at 16 (comma omitted).

The government argues that other sessions of this Court have "routinely concluded that [the Court] lacks jurisdiction to consider whether an alien is subject to mandatory detention when such determination is subject to review in Immigration Court." ECF 10, at 18. But the cases the government relies upon are inapposite. Each was brought by a petitioner who had been detained pursuant to 8 U.S.C. § 1226(c)(1) *after* an Immigration Judge concluded that he was removable because he had been convicted of an offense covered by 8 U.S.C. § 1227(a)(2). *See Alphonse v. Moniz*, 21-cv-11844-FDS, 2022 WL 279638, at *2-*3 (D. Mass. Jan. 31, 2022); *Zaoui v. Horgan*, 13-cv-11254-DPW, 2013 WL 5615913, at *1 (D. Mass. Aug. 23, 2013); *Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455, 464-65 (D. Mass. 2010). Section 1226(c)(1) mandates detention when an alien "is deportable by reason of having committed" certain offenses covered by Section 1227(a). 8 U.S.C. § 1226(c)(1). Thus, although the petitioners in those cases were challenging their detention under Section 1226(c)(1), each of their claims was predicated on a challenge to an Immigration Judge's antecedent determination that the petitioner was subject to removal on account of being convicted of an offense covered by Section 1227(a)(2). *See Alphonse*, 2022 WL 279638, at *4; *Zaoui*, 2013 WL 5615913, at *1; *Flores-Powell*, 677 F. Supp. 2d at 465. The court in each case concluded that Section 1252(b)(9) barred jurisdiction because the petitioner's claim was inextricably intertwined with the removal proceedings. *See Alphonse*, 2022 WL 279638, at *4; *Zaoui*, 2013 WL 5615913, at *1; *Flores-Powell*, 677 F. Supp. 2d at 467-68. Cakan, in contrast, has not been found removable by an Immigration Court, and the legal issue at the core of Cakan's challenge to his detention is independent of the factual and legal issues encompassed by his

removal proceedings. Section 1252(b)(9) does not, accordingly, prevent this Court from considering the merits of Cakan's habeas petition.

## II.    <u>Lawfulness of Detention.</u>

Cakan contends that he is unlawfully detained because CBP did not have authority to determine that he had abandoned his LPR status and classify him as an applicant for admission when he returned to the United States after a trip abroad and presented a valid green card. The statute under which Cakan is detained, 8 U.S.C. § 1225(b)(2)(A), applies only to "applicant[s] for admission." *See Jennings*, 583 U.S. at 297. Federal law is clear that an LPR "shall not be regarded as seeking an admission into the United States" except in six enumerated circumstances, including, as relevant here, if the LPR "has abandoned or relinquished" LPR status. 8 U.S.C. § 1101(a)(13)(C)(i); *see Lau v. Bondi*, 130 F.4th 42, 47 (2d Cir. 2025) ("[T]he plain language of section 1101 makes clear that LPRs are not considered to be 'seeking . . . admission' upon reentry to the United States unless certain enumerated circumstances . . . are present."); *De Vega v. Gonzales*, 503 F.3d 45, 48 (1st Cir. 2007). The lawfulness of Cakan's detention under 8 U.S.C. § 1225(b)(2)(A) thus turns on whether the CBP officer who examined him possessed the unilateral authority to decide that Cakan had abandoned his LPR status, such that he could be treated as an applicant for admission subject to mandatory detention, before any such factual finding had been made in a final order of removal.

The government does not identify a statute that expressly vests CBP officers with such authority. It relies only on 8 U.S.C. § 1101(a)(13)(C)(i), but offers no affirmative argument that this statute gives CBP authority to decide, in the first instance at a port of entry, that a non-citizen has abandoned his LPR status and must therefore be detained. *See* ECF 10, at 7 (arguing only that "[u]pon [Cakan's] arrival to Boston Logan on April 9, CBP considered [him] to be seeking

admission to the United States pursuant to 8 U.S.C. § [1101(a)(13)(C)(i)] because of evidence that [he] had 'abandoned or relinquished' his LPR status").[4] The statutory phrase "unless the alien . . . has abandoned or relinquished" indicates that the non-citizen's abandonment or relinquishment of LPR status must have happened in the past, but the text says nothing about which entity may make the determination of abandonment or how that determination must be made. 8 U.S.C. § 1101(a)(13)(C)(i).

Construing the statute to empower a CBP officer, rather than an Immigration Court, to make the abandonment determination in the first instance would, however, stand in tension with First Circuit precedent. The First Circuit, like other appellate tribunals, has held that when a non-citizen "has a colorable claim to returning to lawful permanent resident status, the government bears the burden of proving by 'clear, unequivocal and convincing evidence' that he abandoned his status . . . and is therefore ineligible for admission into the United States." *Mahmoud*, 981 F.3d at 125 (quoting *Katebi*, 396 F.3d at 466); *accord Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997) (same); *Matter of Rivens*, 25 I. & N. Dec. 623, 625-26 (BIA 2011) (same). This is a heavy burden, and whether the government has met its burden is a "fact-intensive question." *Mahmoud*, 981 F.3d at 126; *see Aleem v. Perryman*, 114 F.3d 672, 676 (7th Cir. 1997) ("the determination that [LPRs] abandoned their permanent resident status" is "intrinsically fact-specific" (quotation

---

[4] The government does not rely on 8 C.F.R. § 235.1(f)(1)(i), which provides that "[a] person claiming to have been lawfully admitted for permanent residence" when seeking to enter the United States at a port of entry "must establish that fact to the satisfaction of the inspecting officer and must present proper documents in accordance with [8 C.F.R.] § 211.1." *See* ECF 10, at 7. Accordingly, any argument that this regulation gives CBP officers unilateral authority to determine that a non-citizen has abandoned his LPR status, when no such finding has been made by an Immigration Judge, is waived. Whether this regulation is consistent with the statutory scheme; with LPRs' long-recognized due process protections, *see Landon v. Plasencia*, 459 U.S. 21, 32-37 (1982); and with the burden of proof articulated by the First Circuit on the question of abandonment or relinquishment of LPR status, *see Mahmoud*, 981 F.3d at 125, has not been briefed and is not before the Court.

marks omitted)). The analysis typically turns on the non-citizen's intent, with the decisionmaker looking to the non-citizen's "family ties, property holdings, and business affiliations" in the United States and abroad. *Katebi*, 396 F.3d at 466-67; *accord Moin v. Ashcroft*, 335 F.3d 415, 419 (5th Cir. 2003); *Singh*, 113 F.3d at 1514-15. Intent, the First Circuit has explained, "can be a slippery concept," so the analysis must be "holistic" and examine whether the non-citizen's actions "evince his continued intent to return to the United States." *Mahmoud*, 981 F.3d at 126.

The fact-intensive nature of the abandonment determination, coupled with the weighty burden borne by the government, suggests that the determination must be made in a forum in which the non-citizen has notice of the evidence against him and an opportunity to contest that evidence or introduce his own evidence of intent to remain in the United States. *See generally* 8 U.S.C. § 1229a(b) (detailing evidentiary procedures for removal proceedings). Indeed, in every case involving abandonment that the government cites, and that the Court has identified, the determination of abandonment of LPR status was made during removal proceedings in Immigration Court, not by a CBP officer at a port of entry. *See, e.g.*, *Mahmoud*, 981 F.3d at 125; *Katebi*, 396 F.3d at 465; *Moin*, 335 F.3d at 417-18 (describing the "several days of testimony" heard by the Immigration Judge); *Aleem*, 114 F.3d at 675-76 (describing the testimony and documentary evidence introduced in Immigration Court); *Singh*, 113 F.3d at 1513 (evidentiary hearing held). The government has cited no case, nor is the Court aware of any case, concluding that a CBP officer has the authority to make the abandonment determination before entry of a final order of removal premised on a finding of abandonment by an Immigration Judge. This is not surprising: construing Section 1101(a)(13)(C)(i) to empower a single CBP officer to decide that an LPR with a valid green card has abandoned his LPR status—without providing notice of the evidence on which the decision is based and the opportunity to contest that evidence—would

eviscerate the government's burden of proof. And it would open the door to arbitrary executive action, whereby *any* LPR with a valid green card returning from a trip abroad could be deemed an applicant for admission and detained under Section 1225(b)(2)(A), based simply on a CBP officer's say-so.

Rather than affirmatively arguing that CBP officers possess the authority to determine that an LPR has abandoned his permanent residence status, the government instead argues that the LPR bears the burden to show at a port of entry that he has *not* abandoned that status. Specifically, the government contends that "[a]n LPR who, by operation of law, is seeking admission under Section 1101(a)(13)(C) is subject to inspection by a CBP officer and carries the burden of demonstrating his admissibility into the United States." ECF 10, at 3. This contention has multiple flaws. First, Section 1101(a)(13)(C) codifies the opposite of what the government asserts. Rather than providing the means for an LPR to "see[k] admission" into the United States "by operation of law," Section 1101(a)(13)(C) instructs that LPRs "shall *not* be regarded as seeking an admission into the United States." 8 U.S.C. § 1101(a)(13)(C) (emphasis added). And since an LPR is presumptively not regarded as seeking admission into the United States, the LPR does not carry the burden to demonstrate admissibility into the United States. *See Mahmoud*, 981 F.3d at 125; *Katebi*, 396 F.3d at 466. Second, the statute on which the government relies—Section 1225(a)(3)—by its terms requires only aliens "who are applicants for admission or otherwise seeking admission or readmission to . . . the United States [to] be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). As discussed, LPRs are presumptively not "seeking an admission into the United States," *id.* § 1101(a)(13)(C), and there is no statute authorizing CBP to make a determination of abandonment in the first instance, without a hearing in which the government is put to its burden of proof. *Cf. Lau*, 130 F.4th at 48 (holding that DHS cannot treat a returning LPR

as an applicant for admission under 8 U.S.C. § 1101(a)(13)(C)(v) unless it first proves by clear and convincing evidence that the returning LPR committed an offense identified in Section 1182(a)(2)).

The government further contended, for the first time at the hearing, that CBP officers often determine, at ports of entry, that LPRs must be treated as applicants for admission because they fall within Section 1101(a)(13)(C)'s other exceptions. *See* 8 U.S.C. § 1101(a)(13)(C)(ii) through (vi). But there is no evidentiary support for this contention, and the government has cited no case holding that CBP officers have such authority before any final order of removal has been entered in Immigration Court. The closest cases identified by the government involve habeas petitions challenging mandatory detention under 8 U.S.C. §§ 1225(b)(2)(A) and 1226(c)(1)(A) *after* an Immigration Judge has, following a hearing, ordered the petitioner's removal for having committed one or more crimes covered by 8 U.S.C. § 1182(a)(2). *See Bataineh v. Lundgren*, 20-cv-3132, 2020 WL 3572597, at *1-*2 (D. Kan. July 1, 2020); *Ramos Funes v. Searls*, 19-cv-6332, 2020 WL 1956346, at *1 & n.6, *4 (W.D.N.Y. Apr. 23, 2020); *Perez v. Aviles*, 188 F. Supp. 3d 328, 330 (S.D.N.Y. 2016). These cases do not bolster the government's argument that a CBP officer can unilaterally decide that an LPR has abandoned his LPR status before any Immigration Court has so determined in removal proceedings and the LPR has, if desired, obtained review before the Board of Immigration Appeals.

Here, the record is clear that Cakan made a colorable claim to returning lawful permanent resident status when he flew into Logan Airport on April 9, 2025. *See Mahmoud*, 981 F.3d at 125. When examined by the CBP officer, Cakan presented a Form I-551—a green card—that was valid until February 19, 2026. *See* ECF 1-1, at 3; ECF 10-1, ¶ 26. His green card stated that it "evidenc[ed his] permanent residency" and would serve to facilitate his work and travel. ECF 1-

1, at 3-4.[5] Furthermore, unlike the December 2020 NTAs, which were never filed in Immigration

Court, the operative October 31, 2024 NTA in Cakan's removal proceedings did not charge that

he was removable because he had failed to maintain a permanent residence in the United States.

*See* ECF 10-1, ¶¶ 19-21, 23; ECF 13, at 14, 16-18. Thus, when he arrived at the port of entry on

April 9, 2025, Cakan had no reason to believe that CBP would decide that he had abandoned or

relinquished his LPR status, and certainly no reason to marshal evidence otherwise.[6]

Upon Cakan's showing of a colorable claim to returning LPR status, the government bore

the burden to prove, "by 'clear, unequivocal and convincing evidence' that he abandoned his status

. . . and [wa]s therefore ineligible for admission into the United States." *Mahmoud*, 981 F.3d at

125 (quoting *Katebi*, 396 F.3d at 466). At that point, Cakan remained an LPR, and was not an

applicant for admission, because no finding of abandonment or relinquishment had been made by

an Immigration Judge following the fact-intensive assessment of the evidence on the question of

abandonment, and no final order of removal had entered. *See Matter of Lok*, 18 I. & N. Dec. 101,

105-06 (BIA 1981) (holding that an LPR retains his status until the entry of a final administrative

order of removal), *aff'd*, 681 F.2d 107 (2d Cir. 1982); *Matter of Rivens*, 25 I. & N. Dec. at 626 n.4

---

[5] The government contends that a Form I-551, "'in and of itself, does not prevent a finding that
an alien has abandoned [his] permanent residency status.'" ECF 10, at 7 (quoting *Moin*, 335 F.3d
at 419). That may be so, but as the cases on which the government relies explain, the government
still bears the burden, in removal proceedings, of demonstrating that the non-citizen has abandoned
his LPR status "by clear, unequivocal, and convincing evidence." *Moin*, 335 F.3d at 419; *see also
Doe v. Pompeo*, 451 F. Supp. 3d 100, 106 (D.D.C. 2020) (while a green card is not "a sure ticket
into the United States" and a green card holder "might still be inadmissible . . . for any number of
reasons," that determination of inadmissibility is made in the course of "removal proceedings").

[6] On May 5, 2025, DHS updated the superseding NTA to further charge Cakan with failing to
maintain a permanent residence in the United States. *See* ECF 17-1, at 2. This action does not
affect the conclusion that Cakan made a colorable claim of returning to LPR status when he arrived
at Logan Airport on April 9, 2025. The updated NTA does, however, allow the government to
argue, in removal proceedings, that Cakan is removable because he has abandoned his LPR status
under 8 U.S.C. § 1101(a)(13)(C)(i).

(citing *Matter of Lok* for the same proposition). Cakan was not, therefore, an "applicant for admission" subject to mandatory detention under Section 1225(a)(3) and (b)(2)(A).

The government conceded at the hearing that if Cakan is not lawfully detained under Section 1225(b)(2)(A), there is no lawful basis for his detention pending removal proceedings and he must be released. For all the reasons discussed, the Court agrees and concludes that the only statutes on which the government relies—Sections 1101(a)(13)(C)(i) and 1225(b)(2)(A)—do not justify its detention of Cakan. Cakan has, accordingly, established that his ongoing detention is "in violation of the . . . laws . . . of the United States" and that he is entitled to immediate release. 28 U.S.C. § 2241(c)(3).[7] This conclusion does not affect whether the government can demonstrate in removal proceedings that Cakan has abandoned or relinquished his LPR status. But that question must be decided based on the evidence presented in Immigration Court, not based on the unilateral determination of the CBP officer at the port of entry.

## CONCLUSION AND ORDER

For the foregoing reasons, Cakan's petition for a writ of habeas corpus under 28 U.S.C. § 2241 is GRANTED. The respondents are ORDERED to release Cakan from the custody of U.S. Immigration and Customs Enforcement within 48 hours of entry of this Memorandum and Order. The respondents are further ORDERED to file a status report on or before May 21, 2025, confirming that Cakan has been released from custody.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: May 19, 2025

---

[7] Having so concluded, the Court need not consider Cakan's separate contention that his detention violates due process protections.